**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| JORDAN NODAROS, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil Action No. 2:22-cv-355 |
| | ) | Judge Nora Barry Fischer |
| | ) | |
| | ) | |
| UPMC MERCY, | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM OPINION

### I. INTRODUCTION

This civil action arises from Plaintiff Jordan Nodaros' ("Plaintiff" or "Nodaros") employment and subsequent termination from Defendant UPMC Mercy ("Defendant" or "UPMC"). Plaintiff alleges disability discrimination, failure to accommodate and retaliation pursuant to the Americans with Disabilities Act, 42 U.S.C. §§ 12101, *et seq.* ("ADA") in Count I of the Amended Complaint (Docket No. 27), and the Pennsylvania Human Relations Act, 43 P.S. §§ 951, *et seq.* ("PHRA") in Count II. Presently before the Court is the Renewed Motion for Summary Judgment (Docket No. 93) filed by Defendant UPMC on both Counts with supporting documentation.[1] (Docket Nos. 93, 94, 95, 106, 108, 117 & 119). Plaintiff filed a response to the Motion with supporting documentation and audio exhibits. (Docket Nos. 100, 101, 102, 103, 109, 114 & 116). The matter is fully briefed.

Having considered the parties' positions and evidence in accordance with the standard governing motions for summary judgment, for the following reasons, Defendant's Motion for Summary Judgment will be granted in its entirety.

---

[1] On January 10, 2024, Defendant's initial Motion for Summary Judgment was denied without prejudice to refiling after Plaintiff pursued additional discovery concerning her coworker, Britta Kiragis. (Docket No. 80).

## II. BACKGROUND

The following facts are taken from the parties' Concise Statements of Material Facts and Responses thereto (Docket Nos. 94, 100, 101, 108, 114 and 119), and are undisputed unless otherwise indicated. [2]

Plaintiff began working for UPMC in July 2015 as a staff nurse in a progressive care unit. (Docket Nos. 94 & 100 ¶ 3). In October 2017, Plaintiff transferred to a staff nurse position in the UPMC Intensive Care Unit ("ICU"), reporting to Raquel Felix ("Felix"). (*Id.* ¶ 4). She continued reporting to Felix for the duration of her UPMC employment. (*Id.*). Approximately 40 to 60 nurses worked in the ICU, completing either day or night 12-hour shifts, rotating on an irregular basis. Plaintiff worked three shifts (36 hours) per week. (*Id.* ¶¶ 9-10).

<u>Plaintiff's Request for Accommodation ("RFA") in 2018</u>

Plaintiff testified that at the time of her employment with Defendant, she had diagnoses of dysautonomia,[3] esophageal disfunction, gastroesophageal reflux disease ("GERD"), dystonia,[4] severe blood pressure fluctuation, tachycardia,[5] fatigue, B12 deficiency, and postural orthostatic

---

[2] Plaintiff's initial response to Defendant's Concise Statement of Material Facts ("CSMF") did not comply with LCvR 56. Plaintiff filed a Motion to Supplement her Responses. (Docket No. 110). The Court granted the Motion (Docket No. 113), and Plaintiff's Supplemental Response was docketed on July 22, 2024 (Docket No. 114). Thereafter, Defendant filed its Response (Amended) to Plaintiff's Supplement. (Docket No. 119).

The Court further notes that Defendant's CSMF (Docket No. 94) deviates from numerical order after paragraph 53. Consequently, there are two (2) paragraphs numbered 52 and 53. When citing to the CSMF, the Court will designate this discrepancy as ¶ $52^1$ and ¶ $52^2$; and ¶ $53^1$ and ¶ $53^2$. Otherwise, it will follow all original numbering rather than compensate for Defendant's numbering error as attempted by Plaintiff. *See* Plaintiff's Responsive CSMF, Docket No. 100 at ¶¶ 54 -79.

[3] A disorder of the autonomic nervous system that causes disturbances in all or some autonomic functions. https://www.merriam-webster.com/medical/dysautonomia (last visited Nov. 1, 2024).

[4] Any of various conditions characterized by abnormalities of movement and muscle tone. https://www.merriam-webster.com/dictionary/dystonia (last visited Nov. 1, 2024).

[5] Relatively rapid heart action whether physiological or pathological. https://www.merriam-webster.com/dictionary/tachycardia (last visited Nov. 1, 2024).

tachycardia syndrome, also known as "POTS"[6].  (Docket Nos. 101 & 108 ¶ 16).  In February 2018, Plaintiff requested and was granted a week of short-term disability ("STD") leave from February 17, 2018, through February 24, 2018.  (Docket Nos. 94 & 100 ¶ 44; Docket Nos. 101 & 108 ¶ 23).

All requests for disability leave, accommodations for a disability, and FMLA leave are handled by a separate entity, UPMC WorkPartners ("WorkPartners").  WorkPartners also manages all communications with the employee and medical providers relating to these matters.  (Docket Nos. 94 & 100 ¶ 45).[7]  WorkPartners' employees prepare and maintain a record of all material events and communications relating to an accommodation request in a document usually referred to as "Claim Notes."  In addition, WorkPartners' telephone communications with employees and providers are on a recorded line, with consent, and audio clips of the recordings are maintained by WorkPartners.  (Id. ¶ 46).

On February 27, 2018, Felix was informed by WorkPartners STD Team Leader, Robert Cataldi ("Cataldi") that Nodaros was being released to return to work with the restriction of working daytime shifts only.  (Docket Nos. 101 & 108 ¶ 24).  WorkPartners inquired with Felix if the unit was able to accommodate Nodaros' listed restrictions.  Felix indicated that she could do so.  (Id. ¶ 25).  In fact, Felix continued to voluntarily schedule Plaintiff for only day shifts until the middle of December 2018.  (Nodaros Time Records, Docket No. 61-4 at 37-62).

On March 14, 2018, Felix emailed WorkPartners' Return to Work Coordinator, Kendall Weiland ("Weiland") to inquire if Nodaros' accommodation was permanent or temporary.

---

[6] A collection of symptoms marked by sudden lightheadedness when standing up and an unusually fast heartbeat. https://www.health.harvard.edu/blog/pots-lightheadedness-and-a-racing-heart-202110012608 (last visited Nov. 1, 2024).

[7] Plaintiff failed to provide a supplemental response (Docket No. 114) to Defendant's CSMF (Docket No. 94) at paragraph 45.  Therefore, pursuant to LCvR 56 E., this paragraph is deemed admitted.

(Docket Nos. 101 & 108 ¶ 26).  Weiland confirmed that WorkPartners was reviewing Nodaros' restrictions to determine a timeframe and whether the restrictions were medically supported.[8] (*Id.* ¶ 27).

As reported in the WorkPartners' Claim Notes, Plaintiff's physician, Dr. Erek Lam ("Dr. Lam"), informed the WorkPartners' Nurse Case Manager in a telephone conversation on May 1, 2018, that "there is nothing that I have at this time that would say she cannot work nights."  This call was recorded, and the audio clip maintained by WorkPartners.  (Docket Nos. 94 & 100 ¶ 49; Audio Exhibits, Docket No. 116 at Exhibit 1).  By letter dated July 27, 2018, Plaintiff's request for day shifts only was denied by WorkPartners for lack of medical support.  (*Id.* ¶ 50).  As noted above, Felix continued to voluntarily schedule Plaintiff for only day shifts.  (Docket No. 61-4 at 37-62).

On August 1, 2018, Nodaros provided Felix with a note from Dr. Lam stating the following:

> To Whom It May Concern: Ms. Jordan Nodaros is a patient under my medical care with a history of dysautonomia, postural orthostatic tachycardia syndrome, and presyncope of which symptoms are worse in the setting of sleep deprivation and shift work. Because of her neurologic/autonomic condition I have recommended that she refrain from working a night shift due to exacerbation of symptoms. Please contact my office at the number above with any further questions.

(Docket Nos. 101 & 108 ¶ 33).  Felix indicated to Nodaros that she was required to proceed through WorkPartners, the appropriate channel for RFAs.  To that end, Felix reminded Nodaros

---

[8]The necessity of medical evidence depends upon whether the alleged impairment is within the comprehension of a jury that does not possess a command of medical or otherwise scientific knowledge.  *Morgan v. Allison Crane & Rigging LLC*, 114 F.4th 214, 225 (2024) (citing *Marinelli v. City of Erie, Pa.*, 216 F.3d 354, 360 (3d Cir. 2000) ("[A] herniated disk is a spinal injury that is 'not within the comprehension of a jury that does not possess a command of medical or otherwise scientific knowledge.'")).  *See e.g., Marinelli*, 216 F.3d at 361 (Arm and neck pain do not require medical evidence.).  Here, the parties do not dispute that Plaintiff's alleged impairments require medical evidence.

that on July 27, 2018, WorkPartners had denied her accommodation request based on Dr. Lam's statement that there was nothing to suggest that Nodaros could not work nights.  So as of August 1, 2018, there was no accommodation request pending.  (*Id.*).

Approximately two months later, on October 2, 2018, Plaintiff submitted another RFA, again requesting a day shift only accommodation.  (Docket Nos. 94 & 100 ¶ 51).  On October 17, 2018, Plaintiff's doctor submitted a completed Medical Inquiry Form in support of her RFA.  Dr. Lam's medical assessment did not mention night or day shifts, but only mentioned "lightheadedness with standing."  The report also checked "no" to the question: "Does the disability affect the employee's ability to perform specific job functions."  When asked for suggested accommodations, Dr. Lam wrote: "Avoid prolonged standing, quick postural movements. Avoid long duration of shifts and excessive physical activity."  (Medical Inquiry Form, ECF No. 61-4 at 19-24).

On November 1, 2018, WorkPartners informed Plaintiff by letter that her RFA was denied because it lacked sufficient medical support.  (Docket Nos. 94 & 100 ¶ 53[1]).  Plaintiff produced the "[to] whom it may concern" note dated August 1, 2018, from Dr. Lam in which he stated that "[b]ecause of her neurologic/autonomic condition, I have recommended that she refrain from working a night shift due to exacerbation of symptoms."  Plaintiff testified that she gave this letter to Felix, who told her she must go through WorkPartners, the appropriate channel for RFAs.  (*Id.* ¶ 52[2]).  Again, at this time, Felix continued to voluntarily schedule Plaintiff for day shifts only.  (Docket No. 61-4 at 37-62).

On November 9, 2018, Plaintiff informed WorkPartners' Disability Management Coordinator, Kelly Dennis ("Dennis"), that she had the "[t]o whom it may concern" doctor's excuse dated August 1, 2018.  Dennis, however, informed Plaintiff that even with a doctor's

note, supporting medical documentation was required: "We have to show that we have documented your medical condition and that the medical condition is impacted by night shifts in this case . . . ." (*Id.* ¶ 53[2]; Docket No. 61-4 at 27). Dennis further informed Plaintiff that there was nothing in any medical documentation from Dr. Lam that indicated she could not work night shifts, and that Cleveland Clinic had refused to provide any records. (Docket Nos. 94 & 100 ¶ 55). Dennis also informed Plaintiff she had been unable to get any current office notes from Dr. Lam's office. Plaintiff stated that she would have Dr. Lam's office send in current notes. (*Id.*; Docket No. 61-4 at 26-31).

In December, after receipt of additional office notes, WorkPartners' Medical Director, Dr. Michael Rowe ("Dr. Rowe") reviewed the entire claim file and concluded that there was no medical support for the restrictions sought by Plaintiff. (Docket Nos. 94 & 100 ¶ 56). In a letter dated December 27, 2018, Plaintiff was informed that her RFA was denied and the reasons for the denial. (*Id.* ¶ 57).

<u>Plaintiff's RFA in 2019</u>

In January 2019, Plaintiff submitted another RFA requesting relief from night shifts. (*Id.* ¶ 59). There was a delay—until March 18, 2019—before Plaintiff submitted any medical information to WorkPartners to support her renewed RFA. (*Id.* ¶ 60). In fact, on March 6, 2019, WorkPartners reminded Plaintiff to send in her paperwork. (*Id.*).

On March 18, 2019, Plaintiff submitted records from Dr. Lam's office and Cleveland Clinic. (*Id.* ¶ 61). The records from Dr. Lam were the same ones she had submitted the year before, and which had been determined not to support a day shift only accommodation. (*Id.*). The records Plaintiff submitted from the Cleveland Clinic were from 2014 and made no mention of night shifts or any restrictions on Plaintiff's activities. (Docket No. 61-4 at 104-125).

On March 21, 2019, Dennis called Plaintiff to discuss her current RFA. (Audio Exhibits, Docket No. 116 at Exhibit 3). In the 17-minute phone conversation, Dennis reviewed Plaintiff's accommodation requests and her history of working day and night shifts. (*Id.*). She acknowledged Plaintiff's medical issues but indicated that the medical documentation she submitted thus far did not indicate why she was unable to work the night shift as opposed to the day shift. (*Id.*). Dennis encouraged Plaintiff to submit further medical documentation from a medical appointment the day before, and explained that in the interim, Plaintiff should apply for intermittent FMLA as a "safety net." (*Id.*). Plaintiff explained to Dennis why working night shifts exacerbated her symptoms. (*Id.*). Dennis indicated that she had spoken to WorkPartners' medical director twice that day and that he would contact Dr. Lam for additional information in a "peer to peer" call. (*Id.*). Dennis also explained that if the RFA was approved, she would have to go back to Plaintiff's supervisor to confirm that a day shift accommodation would not present an undue hardship on her unit. (*Id.*). Thereafter, Plaintiff indicated that if the accommodation did present an undue hardship, she would have to get another job. (*Id.*). Dennis explained that there had to be enough people to work the night shift and emphasized that she was handling the claim just as she had handled every other claim under the ADA. (*Id.*). Dennis acknowledged Plaintiff's frustration and expressed her hope that one call from the medical director to Dr. Lam would conclude the process. (*Id.*). Finally, Plaintiff thanked Dennis and indicated that she would call Dr. Lam's office and have her most current notes faxed to WorkPartners. (*Id.*).

On April 8, 2019, Dr. Lam submitted additional office notes to WorkPartners. Upon receipt of those records, the WorkPartners' medical director contacted Dr. Lam by telephone and interviewed him about Plaintiff's accommodation request. (Docket Nos. 94 & 100 ¶ 63). Based on the discussion with Dr. Lam, WorkPartners approved Plaintiff's RFA and contacted Felix to

ask if the ICU could accommodate the request without undue hardship. Felix replied as follows: "Hi. Yes, the ICU can accommodate. Thank you for your closing the loop!" (*Id.* ¶ 64). By letter dated April 15, 2019, Plaintiff was informed that her RFA was approved and that she would not be scheduled to work night shifts going forward. (*Id.* ¶ 65). Plaintiff was not scheduled to work night shifts after the accommodation was approved. (*Id.* ¶ 66).

From December 17, 2018, until her day shift accommodation was approved on April 15, 2019, Plaintiff worked approximately eleven (11) night shifts. (Docket No. 61-4 at 55-62).

<u>UPMC Controlled Substances Policy</u>

UPMC uses Automated Dispensing Cabinets ("ADC") that are integrated with a Controlled Substances Vault ("CS Vault") in order to have closed-loop management of Controlled Substances ("CS"). CS are tracked via automated barcode restocking as they are transferred and returned to and from ADCs and the CS Vault. (Docket Nos. 101 & 108 ¶ 49). A once-monthly inventory count of the ADC CS Vault must be performed, wherein two pharmacy staff verify all CS in inventory by manual reconciliation of the CS actual inventory counts with the expected inventory counts. Documentation of this process must be kept as required by law. (*Id.* ¶ 50). Medications must be charted within one hour of removal from the ADC or from stock, and generally must be charted at the time of administration by the physician and/or nurse. (*Id.* ¶ 54). Reports of weekly ADC inventory counts are reviewed collaboratively by Nursing and Pharmacy and noncompliance is reported to the appropriate unit director or department management for monitoring and follow-up. (*Id.* ¶ 56). When a discrepancy is found, it must be resolved by the end of the shift, ideally by a nurse with shift responsibility to assure all discrepancies are resolved by checking the ADC screen. (*Id.* ¶ 58). If a discrepancy cannot be resolved by the end of the shift, a report is filed in "RiskMaster," and a detailed statement of

events and supporting evidence must be submitted to Pharmacy Administration and the Unit Director or Department Head. (*Id.*). At this point, persons involved with the discrepancy may be asked to submit written explanations of the events leading up to the discrepancy within 48 hours. (*Id.* ¶ 59). The Drug Enforcement Agency ("DEA") and Pennsylvania Attorney General, Bureau of Narcotic Investigation and Drug Control are only notified if there is a significant loss. (*Id.* ¶ 60).

Spring 2019 ICU CS Audits and Re-education

When issues involving missing medications arise, an investigative body called the Controlled Substances Group ("CS Group") is notified. (Docket Nos. 94 & 100 ¶ 12). Thereafter, the CS Group conducts an investigation. (*Id.*). The CS Group consists of the Chief Nursing Officer, the Unit Director for the nurse involved, the Director of Human Resources, the Pharmacy Director, and the Director of Nursing. (*Id.*).

In early March 2019, the ICU had two infusions of fentanyl that were unaccounted for in a two-day period. (*Id.* ¶ 13). The Pharmacy reported this to the DEA and the Attorney General's Office. UPMC was required to complete investigations and to put together a plan of correction for the Attorney General's Office. (*Id.*). Andrea Sargent ("Sargent"), Director of Pharmacy, developed and communicated to the CS Group a seven-point plan of action, which included, among other things, further investigation, and discipline of the two nurses involved with the missing fentanyl, an audit of 14 transactions of the three ICU nurses with the highest diversion scores[9], additional training in handling CS for the ICU nurses, and further audits by Pharmacy. (*Id.* ¶ 14). Plaintiff was one of the three nurses in the ICU with the highest diversion scores that

---

[9] Diversion scores are numerical indicators that are automatically populated through the pharmacy software. Diversion scores track the habits of a nurse or a provider when they are pulling medications from Automatic Dispensing Cabinets ("ADC"). The algorithm compares a user's transactions to other users within the system to render a score that is meant to show comparative abnormalities. It is an automatic calculation. (Docket Nos. 101 & 108 ¶ 74).

month, so she and the other two nurses were audited. Plaintiff's audit in March disclosed documentation errors. (*Id.* ¶ 15). Plaintiff and the other two nurses were required to explain the discrepancies, which Plaintiff did in two emails to Felix. (*Id.* ¶ 17).

Felix contacted Plaintiff by telephone on April 3, 2019, to go over the CS discrepancies and to counsel her on the proper procedures for handling CS. Plaintiff was not disciplined as a result of this audit. (*Id.* ¶ 18). One of the action items noted by Pharmacy Director Sargent was re-education of all ICU nurses in the handling of CS. (*Id.* ¶ 19). All nurses in the ICU went through the re-education process, including Plaintiff. (*Id.* ¶ 20). In connection with the March audit and re-education, Plaintiff testified that she was not treated any differently than the other nurses in the ICU. (Nodaros Dep., Docket No. 58-10 at 22, pp. 89-90).

<u>August 2019 Audit and Events Leading to Plaintiff's Termination</u>

The individuals in the CS Group in August 2019 were Vice President of Patient Care and Chief Nursing Officer Leeanna McKibben ("McKibben"), Pharmacy Director Sargent, Director of Nursing Colleen Sunday ("Sunday"), Clinical Director Samantha Zych ("Zych"), Human Resources Director Stacie Jesionowski ("Jesionowski"), and the Unit Director for the employee under investigation, who for Plaintiff, was Felix. (Docket Nos. 94 & 100 ¶ 25). In an email dated August 29, 2019, Felix informed the CS Group as follows: "Attached is my monthly CS audit on the RN with the highest diversion score this month, Jordan Nodaros. The first two transactions have missing documentation that it was given, one with a missing order. Let me know of any further action to be taken." (Docket No. 58-15 at 10). Plaintiff was interviewed by Felix in connection with the audit results and given an opportunity to address the discrepancies. (Docket Nos. 94 & 100 ¶ 28). Plaintiff provided a written explanation. (*Id.* ¶ 29).

Pharmacy audited an additional 30 days of Plaintiff's CS transactions on August 30,

2019.  (Docket Nos. 58-15 at 20-25, 26-31).  This audit resulted in additional discrepancies being identified by Pharmacy and shared with the CS Group.  (*Id.*).  Plaintiff was interviewed by the CS Group in connection with the second audit on September 5, 2019 and given an opportunity to address the discrepancies.  (Docket Nos. 94 & 100 ¶ 31).  As noted in a September 5, 2019 email from Senior Human Resources Consultant Keri Berliner ("Berliner"), Pharmacy was preparing to do another 30-day audit of Plaintiff's transactions.  (*Id.*).

On September 5, 2019, Plaintiff was suspended pending further investigation and required to take a fitness for duty examination.   This is a standard procedure during investigations of CS Policy violations.  (*Id.* ¶ 32).  Pharmacy performed an additional 30-day audit on September 6, 2019, which resulted in a finding of seven violations of the CS Policy. (*Id.* ¶ 33).  Plaintiff was interviewed by the entire task force on September 11, 2019, regarding the most recent audit findings involving six events.   (*Id.* ¶ 34).   Berliner summarized the interview in an email to the CS Group as follows: "Overall, she did not have any valid explanations for her documentation, wasting, and administration errors. She said multiple times that she puts patient care over documentation and did not seem to fully realize that good documentation is good patient care."  (*Id.* ¶ 35).   Berliner continued that "[s]he ended the meeting with confirming that she knows that her documentation is 'bad[,]' and she has a lot of work to do." (Docket No. 102-4 at 63).

On September 11, 2019, Felix sent an email to the CS Group that stated:

> I have concerns regarding the following issues:
>
> 1. This is a recurring problem over the past year. She was involved in the spring with 2-3 occurrences. With education that she completed and heightened awareness around controlled substances and processes, she continues to make the same mistakes. This was supported by the routine CS audit, as well as the additional 30 days audit.

2. Policy & procedure violation on multiple accounts. Jordan is fully aware of the policy and procedure when handling a CS. When asked how a medication order should look, she was able to articulate the components of an order.

3. Some of her explanations for the medication events were diverting from the processes and education in place. Clearly each instance is situational, however, she was not able to provide any valid explanations.

I feel as though this should result in termination, and my biggest concern is the decision to report to the state. I do not fully understand the implications with reporting. Are we able to meet briefly tomorrow to discuss this?

(Docket No. 102-4 at 61-62). The discharge recommendation was discussed by the full task force on September 12, 2019, and all members agreed with the decision. (Sargent Dep., Docket No. 58-12 at 27, p.110; Zych Dep., Docket No. 58-16 at 16, pp. 51-53). The re-education training that Plaintiff had just completed was a factor discussed by the CS Group in connection with the termination decision. (Zych Dep., Docket No. 58-16 at 17, p.54). Plaintiff was informed of her discharge over the telephone on September 13, 2019. She was told that she was being discharged for the mishandling of CS and narcotics. She was given no other reasons for her discharge. (Docket Nos. 94 & 100 ¶ 39). Plaintiff was sent a termination letter dated September 13, 2019, that confirmed that she was discharged for violations of the CS Policy. (Id. ¶ 40). The detailed reasons for Plaintiff's discharge were set forth in a discipline authorization form approved by Felix, Human Resources Director Jesionowski, and Vice President of Patient Care Services and Chief Nursing Officer McKibben. (Sargent Dep., Docket No. 58-12 at 27, pp. 12-13; Sargent Exh. 16, Docket No. 58-13 at 44-45; Felix Dep., Docket No. 58-14 at 27-28, pp. 209-10; Felix Exh. 37, Docket No. 58-15 at 50-51). The consensus of the CS Group was that Plaintiff was not diverting drugs, but that she was guilty of sloppy practices. Therefore, it was

decided not to report Plaintiff to the Attorney General or to the DEA.  Instead, Plaintiff was reported to the Board of Nursing for practicing out of scope.  (Docket Nos. 94 & 100 ¶ 42).

On November 14, 2019, Plaintiff filed a Charge of Discrimination ("Charge") with the Equal Employment Opportunity Commission ("EEOC") against UPMC Mercy.  The Charge was dual filed with the Pennsylvania Human Relations Commission ("PHRC").  (Amended Complaint and Answer, Docket Nos. 27 & 30, respectively, ¶¶ 71-72).

This lawsuit followed. After completion of discovery and an unsuccessful ADR session (Docket No. 21), Defendant then moved for summary judgment.  (Docket No. 93).

## III.  LEGAL STANDARD

Summary Judgment is appropriate when the moving party establishes "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ P. 56(a).  A genuine dispute of material fact is one that could affect the outcome of the litigation.  *Willis v. UPMC Children's Hosp. of Pittsburgh,* 808 F.3d 638, 643 (3d Cir. 2015) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).  However, "[w]here the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no genuine issue for trial."  *N.A.A.C.P. v. N. Hudson Reg'l Fire & Rescue*, 665 F.3d 464, 475 (3d Cir. 2011) (quoting *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)).

The initial burden is on the moving party to adduce evidence illustrating a lack of genuine, triable issues.  *Hugh v. Butler Cnty. Family YMCA*, 418 F.3d 265, 267 (3d Cir. 2005) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 323-24 (1986)).  Once the moving party satisfies its burden, the non-moving party must present sufficient evidence of a genuine issue, in rebuttal.  *Santini v. Fuentes*, 795 F.3d 410, 416 (3d Cir. 2015) (citing *Matsushita Elec. Indus. Co.*, 475

U.S. at 587). When considering the parties' arguments, the court is required to view all facts and draw all inferences in the light most favorable to the non-moving party. *Id.* (citing *United States v. Diebold, Inc.*, 369 U.S. 654, 655 (1962)).

Nonetheless, a well-supported motion for summary judgment will not be defeated where the non-moving party merely reasserts factual allegations contained in pleadings. *Betts v. New Castle Youth Dev. Ctr.*, 621 F.3d 249, 252 (3d Cir. 2010) (citing *Williams v. Borough of West Chester*, 891 F.2d 458, 460 (3d Cir. 1989)). The non-moving party must resort to affidavits, depositions testimony, admissions, and/or interrogatories to demonstrate the existence of a genuine issue. *Guidotti v. Legal Helpers Debt Resolution, L.L.C.*, 716 F.3d 764, 773 (3d Cir. 2013) (citing *Celotex Corp.*, 477 U.S. at 324).

## IV. DISCUSSION

UPMC sets forth several arguments in support of its Motion for Summary Judgment. (Docket No. 95). First, it asserts that it did provide Plaintiff with the requested accommodation and that WorkPartners diligently interacted with Plaintiff for over a year and a half to determine whether there was a medical justification for Plaintiff's request for day shifts only. UPMC concludes, therefore, that the delay between Plaintiff's initial RFA, and the eventual granting of the accommodation did not result from a bad faith failure to assist Plaintiff. (*Id.* at 8-10). Second, Defendant maintains that Plaintiff was not discharged because of her disability, but due to multiple violations of the CS Policy shortly after undergoing re-education. (*Id.* at 10-16). Defendant further argues that Plaintiff cannot show that Defendant's reason for discharge is pretext for a retaliatory motive. (*Id.* at 16-20). In response, Nodaros contends that disputed issues of material fact preclude summary judgment. (Docket Nos. 103 & 109). The Court addresses each of these arguments, in turn.

A.    <u>Termination in Violation of the ADA and PHRA</u>

Plaintiff alleges that Defendant unlawfully terminated her because of her disability in violation of the ADA and the PHRA.  (Amended Compl., ECF No. 27 at Counts I & II).  The ADA prohibits an employer from discriminating against "a qualified individual on the basis of disability in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment."  42 U.S.C. § 12112(a) (2009).[10]  The PHRA similarly prohibits discrimination because of disability.  43 P.S. § 955(a).[11]

Where, as here, there is no direct evidence of discrimination, the Court applies the familiar *McDonnell Douglas* burden-shifting paradigm.  *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802-03 (1973); *see also Walton v. Mental Health Ass'n of Se. Pa.*, 168 F.3d 661, 667-68 (3d Cir. 1999).  Plaintiff has the initial burden to establish a *prima facie* case of discrimination.  *Colwell v. Rite Aid Corp.*, 602 F.3d 495, 504 (3d Cir. 2010) (citing *Williams v. Phila. Hous. Auth. Police Dep't.*, 380 F.3d 751, 759 (3d Cir. 2004)).  To establish a *prima facie* case of discrimination under the ADA, a plaintiff must show that (1) she was disabled within the meaning of the ADA; (2) she was otherwise qualified to perform the essential functions of the job, with or without reasonable accommodations by the employer; and (3) she suffered an

---

[10]  A "qualified individual" with a disability includes "an individual who, with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds or desires."  42 U.S.C. § 12111(8) (2009).  "The term 'disability' means, with respect to an individual—(A) a physical or mental impairment that substantially limits one or more major life activities of such individual; (B) a record of such an impairment; or (C) being regarded as having such an impairment . . . ."  42 U.S.C. § 12102 (2009).  "[M]ajor life activities include, but are not limited to, caring for oneself, performing manual tasks, seeing, hearing eating, sleeping, walking, standing, lifting, bending, speaking, breathing, learning, reading, concentrating, thinking, communicating, and working."  42 U.S.C. § 12102 (2009).

[11] The Court of Appeals for the Third Circuit has "held that the PHRA is to be interpreted as identical to federal anti-discrimination laws except where there is something specifically different in its language requiring that it be treated differently."  *Fogleman v. Mercy Hosp., Inc.*, 283 F.3d 561, 567-68 (3d Cir. 2002) (citing *Dici v. Commonwealth of Pennsylvania*, 91 F.3d 542, 552 (3d Cir. 1996)).  Here, the parties do not contend that the PHRA should be interpreted any differently from federal law in this case.

adverse employment action because of her disability. *Fowler v. AT&T, Inc.*, 19 F.4th 292, 299 (3d Cir. 2021).

Here, Defendant does not challenge that Plaintiff is a disabled person, was qualified for the position that she held, engaged in a protected activity, and/or was subjected to an adverse employment action. (Docket No. 95 at 12). Instead, Defendant contends that Plaintiff was terminated entirely because of her violations of the CS Policy after re-education. (*Id.* at 12-16).

For present purposes, the Court will assume that a *prima facie* case has been established with respect to Plaintiff's discrimination claim because the burden at the *prima facie* stage is "much less onerous than proving pretext with similar evidence." *Rhoden v. Children's Hosp. of Pittsburgh,* 2:14-0411, 2017 WL 4224655, at *4 (W.D. Pa. Sept. 22, 2017) (quoting *Opsatnik v. Norfolk S. Corp.*, Civil Action No. 06-81, 2008 WL 763745, at *4 (W.D. Pa. March 20, 2008), *aff'd* 335 F. App'x 220 (3d Cir. 2009) (citing *Simpson v. Kay Jewelers,* 142 F.3d 639, 646 (3d Cir. 1998)). *See also Moussa v. Pa. Dep't of Pub. Welfare,* Civil Action No. 07-9, 2010 WL 1333333, at *8 (W.D. Pa. March 31, 2010) (analyzing the plaintiff's claims at the pretext stage where the defendant's *prima facie* and pretext-based arguments each relied on the same evidence).

Next, the burden shifts to Defendant "to articulate some legitimate, nondiscriminatory reason" for its employment decision. *Fowler*, 19 F.4th at 299 (citing *Walton*, 168 F.3d at 668). In the instant case, Defendant's articulated reason for its decision to terminate Plaintiff was her violations of the CS Policy after re-education. The specific reasons for Plaintiff's discharge were detailed in a "Corrective Action Discipline Authorization" form which set out Plaintiff's violations of the UPMC Controlled Substance Policy, HS-PH2000-PRO, as follows:

On Thursday, August 29th a random 30-day audit was done by the ICU Unit Director on Jordan Nodaros, the below discrepancies were found:

- A dose of 5 mg of oxycodone is removed, 2.5 mg is wasted appropriately; 2.5 mg is not charted as given.

- A vial of 100 mcg of fentanyl is removed, the dose ordered was 50 mcg; 75 mcg was wasted; no documentation of administration.

- A syringe of 0.5 mg hydromorphone was vended; dose ordered was 0.4 mg; 0.4 mg is charted; 0.1 mg of waste is missing.

- Hydromorphone with a documented waste of 0.2mg. The appropriate waste should have been 0.1mg.

An additional 30-day audit was completed on Friday September 6th by pharmacy, the below discrepancies were found:

- A dose of hydromorphone that is charted as administered prior to vending from the cabinet.

- Narcotics administered with pain score mismatch.

- Two doses of lorazepam that are charted as administered but also documented as wasted.

- Lack of pre-dose assessment for fentanyl.

- 16.2 mg phenobarbital vended but 32.4 mg is charted.

- An order for 100 mcg of fentanyl was administered as two 50 mcg transactions.

(Corrective Action Discipline Authorization form, Docket No. 61-6 at 45-46). The form further indicates that Plaintiff "has completed education and there has been heightened awareness around controlled substances and processes on the unit, and yet she continues to make these mistakes." (*Id.*). Plaintiff does not dispute that the ten (10) documentation errors noted on this form were, in fact, errors. (Nodaros Dep., Docket No. 61-3 at 29, pp. 125-26).

To defeat Defendant's Motion for Summary Judgment, Plaintiff must point to some evidence that might cause a factfinder to either "(1) disbelieve the employer's articulated legitimate reasons; or (2) believe that an invidious discriminatory reason was more likely than not a motivating or determinative cause of the employer's action." *Stanziale v. Jargowsky,* 200 F.3d 101, 105 (3d Cir. 2000). A plaintiff must do more than "simply show that the employer's decision is wrong or mistaken, since the factual dispute at issue is whether discriminatory animus motivated the employer, not whether the employer is wise, shrewd, prudent, or competent." *Fuentes v. Perskie*, 32 F.3d 759, 765 (3d Cir. 1994) (citations omitted). She must provide evidence that could "allow a factfinder reasonably to infer that *each* of the employer's proffered non-discriminatory reasons . . . was either a post hoc fabrication or otherwise did not actually motivate the employment action." *Id.* at 764 (emphasis in original) (citations omitted).

As to the first prong, Plaintiff "must demonstrate such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in [defendant's] proffered legitimate reasons for its actions that a reasonable factfinder could rationally find them 'unworthy of credence.'" *Lichtenstein v. Univ. of Pittsburgh Med. Ctr.*, 691 F.3d 294, 310 (3d Cir. 2012) (quoting *Fuentes,* 32 F.3d at 765). "The question is not whether the employer made the best, or even a sound, business decision; it is whether the real reason is [discrimination]." *Keller v. Orix Credit Alliance, Inc.*, 130 F.3d 1101, 1109 (3d Cir. 1997) (quoting *Carson v Bethlehem Steel Corp.*, 82 F.3d 157, 159 (7th Cir. 1996)).

Under prong two, "a plaintiff must provide evidence that allows the factfinder to infer that discrimination was the 'but-for' cause of the employer's decision." *Surman v. UPMC Presbyterian Shadyside,* Civ. A. No. 17-184, 2018 WL 4901107, at *9 (W.D. Pa. Oct. 9, 2018) (quoting *Anderson v. Mack Trucks, Inc.,* 118 F. Supp. 3d 723, 741 (E.D. Pa. 2015) (citation

omitted)). Plaintiff may do so by showing "that the employer treated other, similarly situated persons not within his class more favorably, or that the employer discriminated against other members of his protected class." *Moussa*, 2010 WL 1333333, at *9 (quoting *Fuentes*, 32 F.3d at 765). *See also Wright v. Providence Care Center, LLC*, 822 F. App'x 85, 92 (3d Cir. 2020) (citing *Simpson*, 142 F.3d at 645) ("[P]laintiff can demonstrate pretext by presenting evidence that similarly situated persons not within plaintiff's protected class were treated more favorably by defendant employer.")).

In the instant case, Plaintiff contends that Defendant's proffered reason for her termination—violation of the CS Policy after re-education—is pretext for unlawful discrimination because other employees who violated the CS Policy, rather than be terminated, were given Performance Improvement Plans ("PIPs"). (Docket No. 103 at 11-14). To establish pretext by comparison to other employees, Plaintiff must demonstrate that similarly situated employees outside of the protected class were treated more favorably or were accused of the same offense but disciplined in different ways. *Zahavi v. PNC Fin. Serv. Group, Inc.*, Civil Action No. 07-376, 2009 WL 904699, at *12 (W.D. Pa. Mar. 31, 2009) (citing *Wheeler v. Aventis Pharm.*, 360 F.3d 853, 858 (8th Cir. 2004)). Employees are "similarly situated" when they "dealt with the same supervisor [and] engaged in the same conduct without such differentiating or mitigating circumstances that would distinguish their conduct or the employer's treatment of them for it." *Zahavi*, 2009 WL 904699, at *12 (quoting *Ogden v. Keystone Residence*, 226 F. Supp.2d 588, 603 (M.D. Pa. 2002)) (internal quotations omitted). Accordingly, a plaintiff attempting to establish pretext based on inconsistent disciplinary actions must show that the comparator's misconduct "[was] of comparable seriousness to [her] own infraction" and that no "differentiating or mitigating circumstances" existed. *Tyler v. SEPTA*,

Civ. A. 99-4825, 2002 WL 31965896, at *3 (E.D. Pa. Nov. 8, 2002), *aff'd,* 85 F. App'x 875 (3d Cir. 2003).

  In attempting to meet this heavy burden, Plaintiff relies upon five non-disabled alleged comparators that were placed on PIPs instead of being terminated.  Two of the nurses identified, Hollia Smith and Julie Kwiatkowski, were not in the ICU and were not supervised by Felix as reflected in their PIP documents.  (Docket Nos. 102-4 at 53 & 58, respectively).  Therefore, they cannot be comparators because they were not similarly situated in all relevant respects.  *See Wright*, 822 F. App'x at 92 (factors taken into account to determine whether employees are similarly situated include the employee's job responsibilities and supervisors).  The three other nurses, Cody Lindberg, Susan Stokes and Christina Singleton, were subject to the ICU-wide audits in the Spring of 2019 prompted by the missing infusions of Fentanyl.  Their placement on PIPs preceded the completion of the ICU-wide re-education.  (Docket Nos. 101 & 108 ¶¶ 108, 110 & 111).  There is no record evidence that these three nurses committed further violations of the CS Policy after re-education as did Plaintiff.  Therefore, these three nurses are not valid comparators because they were not similarly situated to Plaintiff in all relevant respects.  *See Wright,* 822 F. App'x at 92.  Importantly, Plaintiff was not disciplined as a result of the Spring 2019 audits (Docket Nos. 94 & 100 ¶ 18), and as such, was treated better than those nurses placed on PIPs.  Further, Plaintiff's RFA was approved around this same time.  (Docket Nos. 94 & 100 ¶ 65).  Plaintiff does not dispute the audits and their findings.  (Nodaros Dep., Docket No. 61-3 at 29, pp. 125-26).

  Plaintiff also attempts to raise an issue of material fact by arguing that Defendant had a pattern and practice of discrimination against disabled employees with day shift only accommodations.  (Docket No. 103 at 7-11).  Plaintiff contends that two nurses, Angela Jackson

("Jackson") and Britta Kiragis ("Kiragis"), were also disabled and discriminated against because they had day shift only accommodations. (*Id.*). The record reflects, however, that Plaintiff admitted that Kiragis was not on day shifts because of a disability accommodation, but because she was part of a group of nurses who had been promised, when hired, that they would not have to work night shifts. (Docket Nos. 94 & 100 ¶ 74). Moreover, the Disability Management Coordinator of WorkPartners, Kelly Dennis, declared that WorkPartners has no record of Kiragis making a request for a disability accommodation. These records, maintained from at least 2009, reflect all requests for accommodations by employees of all UPMC affiliated entities. (Dennis Declaration, Docket No. 90-3 at 2-3). Instead, undisputed record evidence reveals that Kiragis was also audited for CS Policy violations. An initial 30-day audit was triggered by a pharmacist's report of missing narcotics where Kiragis was the dispensing nurse. Thereafter, a 90-day audit of Kiragis' CS transactions was conducted which uncovered thirteen CS Policy violations. Kiragis resigned before the conclusion of the investigation. (Jesionowski Decl., Docket No. 90-1 at 1-2, ¶¶ 4-6; Kiragis Audit Files, Docket No. 90-2 at 8-41).

Likewise, with regard to Jackson, text messages reflect that she was granted a dayshift only accommodation, but later issued a written warning, and subsequently suspended, for vulgarity to patients. (Docket No. 102-2 at 143-157). Following same, she resigned. (Docket Nos. 101 & 108 ¶ 106). Although Plaintiff argues that Jackson was disciplined after her accommodation was granted, there is no record evidence that her discipline was unwarranted, or in any way related to the fact that she was granted a day shift accommodation.

Next, Plaintiff relies heavily on an April 4, 2018, email sent by Felix to Human Resources Consultant, Nicole Rogel, that summarizes their conversation of that same day. (Docket No. 103 at 8-9). Plaintiff directs the Court to select portions and argues that the email

demonstrates Felix's bias against those nurses with day shift only accommodations. (*Id.*). When read in its entirety, however, the email seeks input from the Human Resources Consultant as to how to safely staff the ICU night shift with its current employees:

> Hi Nicole,
>
> Here is a summary of our conversation today.
>
> Angela Jackson was approved for a work accommodation stating that she cannot work any overnight shifts. At the time that I was notified of the approval, the schedule was complete. I had my unit schedulers change her PM (7p-7a) shifts to either AM (7a-7p) or 11a-11p shifts to help with our scheduling. In the past 2 weeks that we have been accommodating this, we have asked nurses to change their schedules around to safely staff the unit. This has greatly affected our PM coverage, and is not favored among the rest of the staff as you can imagine.
>
> I wanted your input on this matter because I do have a 1.0 FTE available. She can work 2 12 hour and 2 8 hour shifts, with the 8 hour shifts being 3p-11p. I can see this working, as I have 2 0.5FTEs who work 1 8 hour shift (7a-3p) per week. The only caveat to this is that I have another employee pursuing a 'no overnight shifts' work accommodation. Jordan Nodaros is currently in the process of approval. With her, I do have the ability to move 0.1 FTE over to her in order to make her a 1.0 FTE.
>
> I have concerns with both of these situations. If I move Angela into a 1.0 FTE, I will obviously have to do so with Jordan. Is this accurate?
>
> I also realize that I have employees that were "promised" straight day shifts from 2 managers prior to me. There are about 7 total, including full time, part time, and weekend employees, and they are ALL senior staff with at least 8+ years of experience.
>
> Also, word has spread through the unit that anyone can attempt to obtain a work accommodation for straight days.
>
> The next schedule, May 13th-June 23rd, is now available this week for staff to request shifts. I am unsure on how to proceed, so any feedback would be helpful.

(Docket No. 102-4 at 48-49). Felix's email concerns the logistics of safely staffing the night shift while still accommodating those nurses with day shift only accommodations at a time when the work schedule had already been finalized. (*Id.*). It further reflects that Felix was seeking feedback as to how to handle the next work schedule which was then available for staff to request shifts. (*Id.*). She noted that besides Jackson's accommodation, and eventually Nodaros', there were seven (7) nurses that were promised day shifts by two (2) previous managers. (*Id.*). Felix seeks specific input as to how to manipulate the finalized schedule to fulfill her obligation to accommodate everyone, while safely staffing the unit. (*Id.*).

Plaintiff also contends that certain questions and comments by Felix demonstrate her ongoing hostility concerning Plaintiff's RFA. Plaintiff testified that Felix would continually ask her for updates about the status of her RFA. (Nodaros Dep., Docket No. 61-3 at 10-11, pp.40-41). Again, as suggested in the April 4, 2018 email, Felix expected Plaintiff's RFA to be granted, which would affect Felix's responsibility to safely staff the unit. In the context of the entire record, Felix's inquiries regarding the RFA process simply reflect concern with the timing of when she would be legally obligated to accommodate Plaintiff when planning the unit schedule. Plaintiff also directs the Court to Felix's comment that other nurses would be jealous of her day shift accommodation as evidence of bias and hostility. This comment is simply a statement of a widely held sentiment that most employees prefer day shifts over night shifts.

Rather than demonstrating hostility or bias, the record reflects that Felix voluntarily accommodated Plaintiff from February 2018 until the middle of December 2018, even though Plaintiff's RFAs had been denied by WorkPartners. (Docket No. 61-4 at 37-62). Felix also gave Plaintiff a good performance evaluation on July 27, 2018, several months after Plaintiff's initial RFA:

> Jordan has become an excellent addition to the ICU team.  Her performance at the bedside is a direct reflection of her experience as a floor nurse.  She comfortably cares for her patients in a professional and caring manner.  She is respected by the ICU staff and works cohesively with all members of the care team.

(Docket Nos. 94 & 100 ¶ 68).  Moreover, when Dennis inquired as to whether the ICU could accommodate a day shift only accommodation, Felix emailed that it could and thanked Dennis for "closing the loop!"  (*Id.* ¶ 64).

Finally, record evidence reveals that members of the CS Group involved with the decision to terminate Plaintiff were unaware of Plaintiff's medical issues and RFAs.  For instance, Sargent and Zych both testified that they did not know Plaintiff, did not know she had medical issues, and did not know she had requested accommodations.  (Sargent Dep., Docket No. 61-5 at 25, p.99; Zych Dep., Docket No. 61-9 at 17-18, pp. 57-58).  Zych and Berliner testified that in discussions with the CS Group, there was no mention of Plaintiff's medical issues.  (Zych Dep., Docket No. 61-9 at 18, pp. 58-59; Berliner Dep., Docket No. 61-11 at 16, pp. 70-71.)  Plaintiff testified that she had no reason to believe that either McKibben or Sunday knew of her medical issues or accommodation request.  (Docket Nos. 94 & 100 ¶ 72).

In sum, Plaintiff has failed to come forward with evidence to raise an issue of material fact that her termination was the product of unlawful discrimination.  Instead, the record reflects that Plaintiff was terminated because of her violations of CS Policy after re-education.  Taking the record as a whole and construing all facts and inferences in favor of the Plaintiff, no reasonable factfinder could conclude that Defendant's proffered reason for her termination was pretext for disability discrimination.  *See Matsushita*, 475 U.S. at 587.  Therefore, Defendant's Motion for Summary Judgment on the issue of disability discrimination under the ADA and PHRA will be granted.

B. <u>Retaliation in Violation of the ADA and PHRA</u>

Plaintiff next claims that Defendant retaliated against her for making a Request for Accommodation.  (Amended Compl., Docket No. 27 at Counts I and II). The ADA's anti-retaliation provision states that "[n]o person shall discriminate against any individual because such individual has opposed any act or practice made unlawful by this chapter or because such individual made a charge, testified, assisted, or participated in any manner in an investigation, proceeding or hearing under this chapter.  42 U.S.C. § 12203(a).  The same is true under the PHRA.  43 P.S. § 955(d).

To establish a *prima facie* claim of retaliation, a plaintiff must show that (1) she engaged in a protected activity; (2) her employer subjected her to an adverse employment action; and (3) "a causal connection [existed] between the employee's protected activity and the employer's adverse action." *Williams*, 380 F.3d at 759; *see also Fogleman v. Mercy Hosp. Inc.*, 283 F.3d 561, 567-68 (3d Cir. 2002).  Making a request for a disability accommodation in good faith is a protected activity.  *Shellenberger v. Summit Bancorp, Inc.*, 318 F.3d 183, 191 (3d Cir. 2003) (finding that the right to request an accommodation in good faith is protected conduct), *cited in, Kieffer v. CPR Restoration & Cleaning Servs, Inc.*, 733 F. App'x 632, 638 n.26 (3d Cir. 2018).

As to causation, a plaintiff can generally establish a causal connection by showing that the temporal proximity between the protected activity and the adverse action is "unusually suggestive," or through a combination of timing and other evidence of ongoing antagonism or retaliatory animus.  *Farrell v. Planters Lifesavers Co.,* 206 F.3d 271, 280 (3d Cir. 2000).  If a Plaintiff establishes a *prima facie* case of retaliation, the court continues to the subsequent steps of the *McDonnell Douglas* framework outlined above.  *Shaner v. Synthes*, 204 F.3d 494, 500 (3d Cir. 2000).

Here, Plaintiff identifies her termination as Defendant's adverse action.  Plaintiff, however, has come forward with no evidence pointing to a causal connection between her requests for accommodation and her termination.  Plaintiff's RFA's date back to early 2018, and even considering Plaintiff's final RFA in January 2019, her termination did not occur until September 13, 2019, over eight (8) months later.  Plaintiff fails to establish an "unduly suggestive" temporal proximity between her various requests for accommodation and her termination.  *See Parrotta v. PECO Energy Co.*, 363 F. Supp. 3d 577, 603 (E.D. Pa. 2019) (one year between adverse action and protected activity insufficient to establish temporal proximity) (citing *Williams*, 380 F.3d at 759) (termination occurring two months after protected activity not "unusually suggestive").  In fact, the Third Circuit has stated that "[t]he adverse action must occur within days, not months, of the protected activity."  *Mercer v. SEPTA*, 608 F. App'x 60, 65 (3d Cir. 2015); *see also Lichtenstein*, 691 F.3d at 307 (seven days "is in the realm of what [the Third Circuit] and others have found sufficient at the prima facie stage.").

Furthermore, as discussed, *supra* at IV.A. regarding pretext, Plaintiff is unable to demonstrate an ongoing antagonism or retaliatory animus by Defendant.  There is no record evidence that Defendant took any actions against Nodaros in retaliation for her requests for accommodation.  To the contrary, Defendant granted the accommodation soon after Plaintiff submitted additional medical documentation from Dr. Lam.  While waiting for that medical documentation, Felix voluntarily accommodated Plaintiff for 10 months.[12]  Similarly, the fact that Defendant provided Plaintiff with her requested accommodation does not support the inference that her termination was in retaliation for her RFAs.  Instead, record evidence reflects that Plaintiff was terminated because she violated CS Policy after re-education, and that all

---

[12] Even after Felix began scheduling Plaintiff for night shifts in December 2018, Plaintiff only worked approximately 11 nights from December 17, 2018, until her accommodation was granted on April 15, 2019. (Docket No. 61-4 at 37-62).

decision makers involved with Plaintiff's termination, except Felix, had no knowledge of Plaintiff's RFAs.  *See Moore v. City of Philadelphia,* 461 F.3d 331, 351 (3d Cir. 2006), *as amended* (Sept. 13, 2006) (internal citations omitted) ("It is not reasonable for a factfinder to infer that an employer's reaction was motivated by an intent to retaliate for conduct of which the employer's decision maker was not aware.").

Upon review of the evidence in a light most favorable to Nodaros and drawing all inferences in her favor, no reasonable factfinder could conclude that Plaintiff was terminated in retaliation for her requests for accommodation. *See Matsushita*, 475 U.S. at 587.  Accordingly, summary judgment will be granted on Plaintiff's ADA and PHRA retaliation claim.

C.  Failure to Accommodate

The Court next turns to Plaintiff's Failure to Accommodate claim.  In Plaintiff's Amended Complaint, she alleges that UPMC failed to accommodate her based upon her disability.  (Docket No. 27).  But she did not acknowledge that UPMC granted her accommodation in 2019.  Nor does she complain of any delay in the granting of her RFA.

In its moving brief on summary judgment, Defendant directs the Court to the undisputed fact that Plaintiff's January 2019 RFA was granted in April 2019.  (Docket No. 95 at 8). Thereafter, Defendant assumes that Plaintiff's failure to accommodate claim is premised upon any delay Plaintiff perceived in the granting of the accommodation.  (*Id.*).  In her responsive briefs, Plaintiff argues that the delay in granting her RFA is, in fact, the basis for her failure to accommodate claim.  (Docket No. 103 at 18-20; Docket No. 109 at 7-8).

It is well established that complaints may not be amended through summary judgment motions and supporting briefs. *See Dongelewicz v. PNC Bank Nat'l. Ass'n.*, 104 F. App'x. 811, 819 n. 4 (3d Cir. 2004) (quoting *Williams v. New Castle County*, 970 F.2d 1260, 1266 n. 4 (3d

Cir. 1992)) ("'a contention in a brief' 'clearly ... may not' be used to 'substitute for an allegation in a complaint.'"). The Court set a deadline that pleadings were to be amended by September 13, 2022 (Docket No. 20); no such amendments were ever made; and Plaintiff has neither acknowledged the deadline nor set forth "good cause" to set it aside as is required under Federal Rule of Civil Procedure 16. *See Race Tires America, Inc. v. Hoosier Racing Tire Corp.*, 614 F.3d 57, 84 (3d Cir. 2010) (party seeking leave to amend after deadline expires must show "good cause" and demonstrate that it acted with "due diligence").[13]

Adverse employment decisions in this context encompass the employer's reasonable efforts to assist the employee in seeking an accommodation and to communicate with the employee in good faith. *Colwell v. Rite Aid Corp.*, 602 F.3d 495, 504 (3d Cir. 2010) (quoting *Williams*, 380 F.3d at 761); *see also Lewis v. University of Pennsylvania*, 779 F. App'x 920, 923 (3d Cir. 2019). To prove that an employer failed to provide reasonable accommodations by failing to engage in good faith in an interactive process, a plaintiff must show that "1) the employer knew about the employee's disability; 2) the employee requested accommodations or assistance for his or her disability; 3) the employer did not make a good faith effort to assist the employee in seeking accommodations; and 4) the employee could have been reasonably accommodated but for the employer's lack of good faith." *Colwell*, 602 F.33d at 504 (quoting *Williams v. Philadelphia Hous. Auth. Police Dep't*, 380 F.3d 751, 772 (3d Cir. 2004)). *See also Franzi v. UPMC Presbyterian Shadyside*, Civil No. 12-1432, 2014 WL 4384545, at *13 (W.D. Pa. Sept. 4, 2014).

---

[13] Any amendment to include a claim for delay would be futile, as such claim is time-barred. Each RFA is a one-time occurrence rather than a continuing practice and does not fall under the continuing violations theory. *Mercer v. SEPTA*, 608 F. App'x 60, 63 (3d Cir. 2015) (citing *Aubrey v. City of Bethlehem*, 466 F. App'x 88 (3d Cir. 2012)). Plaintiff dual filed her EEOC charge on November 14, 2019. Consequently, any evidence related to a newly added delay claim occurring before January 18, 2019, would be barred by the statute of limitations. *See* 42 U.S.C. § 2000e-5(e)(1).

Because Plaintiff did not include a claim in her Amended Complaint for Defendant's alleged delay and failure to make good faith efforts to assist her with her RFA, summary judgment on this issue will be granted.

## V.  CONCLUSION

In conclusion, Plaintiff has failed to direct the Court to any record evidence to create an inference that her termination was the product of unlawful discrimination or retaliation.  Instead, the record reflects that Plaintiff was terminated because of her violations of Defendant's CS Policy after she was re-educated on the Policy.  The record further demonstrates that Plaintiff has failed to allege a claim for delay in granting her accommodation.  No rational trier of fact could find in favor of Plaintiff on this record.  Summary judgment is therefore appropriate on each of Plaintiff's claims.


Appropriate Orders follow.

Dated: November 5, 2024


_s/Nora Barry Fischer_
Nora Barry Fischer
Senior U.S. District Judge

cc/ecf: All counsel of record